IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-02327-REB-MJW

CAMERON McARTHUR,

Plaintiff,

v.

SOURCE GAS, LLC,

Defendant.

---

## RECOMMENDATION ON
## DEFENDANT'S MOTION TO DISMISS AND FOR SANCTIONS (Docket No. 73)
### and
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 100)

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

This case is before this court pursuant to an Order of Reference to United States Magistrate Judge issued by Judge Robert E. Blackburn on October 14, 2010.  (Docket No. 6).

## PLAINTIFF'S ALLEGATIONS

Plaintiff commenced this action without counsel with the filing of his pro se Title VII Complaint (Docket No. 3).  Counsel subsequently entered an appearance on behalf of the plaintiff (Docket No. 8), but counsel did not seek to amend the pro se Complaint.  In that pleading, plaintiff asserts the following.

Plaintiff was hired by defendant, SourceGas (hereinafter "SG"), in July 2007.  He was hired by Tammy Gordon, who was plaintiff's immediate supervisor until she

2

suddenly left SG in late November or early December 2007.  When Gordon left SG, it was a "turning point" for plaintiff because what little protection plaintiff had was then gone.  Approximately two to three weeks before Gordon's departure, Steve Saunders was hired as the manager of Plant Accounting, and when Gordon left, he was promoted to her position and thus became the manager of Plant and Corporate Accounting. Plaintiff was a direct report to Saunders.

Around January 2008, plaintiff was promoted to supervisor of Plant Accounting. That month or the following month, plaintiff was asked to help with a time-sensitive matter by two managers in the Operations department, Mitch Pebley and Eric Fritz. There was an e-mail circulating about a problem, and at some point a budgeting question arose.  At that point, plaintiff e-mailed the manager of the Budget and Forecasting group, Patty Zadel, copying Pebley and Fritz.  Later that day, Saunders went to plaintiff's desk and said, "I have a complaint from Patty," and handed plaintiff a hard copy of plaintiff's e-mail and a message sent by Zadel saying, "Does he have to tell the whole world?"  (Docket No. 3 at 6, ¶ 6).  Plaintiff then sent Zadel an e-mail apology. Zadel replied, "I'm fine, but this happens too much in this company and it will come back to bite you. . . ."  (Docket No. 3 at 7, ¶ 8).  Plaintiff forwarded that response to Saunders for his information.

At no point during plaintiff's time in SG was plaintiff ever insubordinate, threatening, inappropriate, or unprofessional to Zadel.  Instead, plaintiff's interaction with her was always polite, courteous, and subordinate.  Plaintiff had a "superb" relationship with the overwhelming majority of the company.

However, on or about Friday, April 18, 2008, Saunders again approached

3

plaintiff's desk and said, "I have a complaint from a director." (Docket No. 3 at 7, ¶ 11).

He then told plaintiff that Zadel "had heard from someone that [plaintiff] had only been

working from nine to four every day." (Docket No. 3 at 7, ¶ 12). Saunders stated he did

not believe that plaintiff was coming in at nine and leaving at four, but he said that Zadel

"heard it from your friends Trent (Batchlor in the tax group) and Amanda (Sorwied in the

treasury group)." (Docket No. 3 at 7, ¶ 11). Plaintiff expressed his concern to Saunders

about Zadel's animosity for him and that "I cannot live under a microscope." (Docket No.

3 at 7, ¶ 14). Plaintiff also asked to be transferred away from the accounting group.

Plaintiff had a deep affection for SG, had great relationships, and wanted nothing more

than to stay in SG. It was clear to plaintiff, however, that Zadel, Marilyn West, and

Saunders wanted plaintiff out of SG. Saunders replied he would look into having

plaintiff transferred out of the group.

As plaintiff was leaving (after five) that day, he rode down the elevator with a co-

worker, and plaintiff asked if she had Zadel's work cell number. It was common around

the office to ask others for someone's contact information, so plaintiff thought nothing of

it. That co-worker said she had two numbers for Zadel in her cell phone, said, "I think

this is the business cell," and gave plaintiff and number which he used around 7:00 that

evening after returning home. (Docket No. 3 at 8-9, ¶¶ 21, 22). Plaintiff used that

number only once and thought nothing of it because he had received calls at home with

work matters from Saunders and others after the eight o'clock hour and on weekends.

Plaintiff also called Trent Batchlor, with whom he had a personal relationship outside the

office as friends, and asked him to talk to Saunders on Monday and clear up the

allegations about plaintiff's work hours. Plaintiff then left a voice-mail message for

4

Zadel, again on what plaintiff believed was her work cell phone.  In that message, plaintiff was courteous and professional, stating that he had received the complaint and was concerned.  Plaintiff asked Zadel if she could please call him at home over the weekend to discuss it because he felt that sending an e-mail requesting a meeting would not be successful in addressing the matter soon.

The next day, which was a Saturday, Zadel called Saunders at home and complained about plaintiff's voice-mail message.  That same day Saunders sent an e-mail requesting a meeting with Vice President Marilyn West on Monday, April 21, 2008.  At that meeting, plaintiff was verbally reprimanded and received a "write up" threatening termination.  "Plaintiff was hurt and baffled by their reaction to an innocent voice mail." (Docket No. 3 at 10, ¶ 31).  He "sincerely believed that Patty Zadel, a white female, intentionally overacted out of spite, malice, and blatant racism.  She and others knew that he being the only black employee in and [sic] office of 150 people, that if she overreacted and acted as though an 'angry black man' was threatening her that he did not stand a chance."  (Docket No. 3 at 10, ¶ 32).  "Zadel, Marilyn West, and Steve Saunders acted in just such a manner with swift, degrading, unfair, reactionary methods that threatened termination in writing and would eventfully [sic] lead to just that." (Docket No. 3 at 10, ¶ 34).

Later that day, Saunders took plaintiff for a walk outside the building and told plaintiff that Zadel "hates" plaintiff and that plaintiff needed to "start looking (for another job)."  (Docket No. 3 at 10, ¶ 35).  Saunders then reiterated Zadel's and others' disdain for plaintiff and that Zadel had acted as though it "was a death threat."  (Docket No. 3 at 10, ¶ 36).  Plaintiff told Saunders that he intended to fight for his job.

5

Around that time, Amanda Candarian was hired into Plant Accounting as a Plant Accountant.  Plaintiff was her supervisor but did not participate in the hiring process, was told after the fact that she was hired, and did not meet her until she started.  During the one month between plaintiff's write up on April 21 and his departure from SG on May 15, Saunders pulled Camdarian into a private meeting room.  The following day Camdarian told plaintiff in private that according to Saunders, she was there to "transition" him out of SG.  Candarian said she felt bad and that plaintiff's duties would be shifting to her.  Plaintiff's work load was gone, and Candarian assumed all duties in the department.  In addition, "people seemed to be told to not come to Plaintiff and to go to Candarian for all matters."  (Docket No. 3 at 11, ¶ 43).

It was clear to plaintiff he was intentionally left out of company training sessions that every employee in the Lakewood office received, which caused him to incur problems related to doing his job.  Plaintiff was also left out of several meetings he should have been included in by West and Saunders.  Plaintiff brought this to West's attention, and she said it would be corrected, but it never was.  Plaintiff also brought it to Saunders' attention on several occasions, only to be "pat on the head."  It was clear to plaintiff that they viewed plaintiff as inferior.

On the morning of May 15, 2008, plaintiff received an e-mail from Saunders entitled "One-on-One" for 4:30 in the afternoon.  Nothing was in the body of that e-mail. Plaintiff requested a "third neutral party outside of HR or accounting to be present if he was being terminated or reprimanded."  (Docket No. 3 at 11, ¶ 45).  Within two minutes, the meeting was moved to the office of Janet Eversman, Director of Human Resources. Plaintiff copied West on the e-mail, went to her office, and stated that he would rather

resign than be terminated as he felt he did not deserve termination.  "West was initially indifferent than hostile."  (Docket No. 3 at 11, ¶ 48).  Plaintiff then left West's office and sent an e-mail to Saunders giving him plaintiff's two-week notice and stating that since plaintiff had some vacation time, he would be taking the rest of the day off to deal with some personal matters.  Plaintiff then left the office, and upon arriving home fifteen minutes later, he was unable to log into his work e-mail account to get a copy of his notice for his personal use because he was locked out.  Plaintiff later learned from security that his badge was immediately disabled within minutes of leaving the building.  Trent Batchlor and Matt Linenmann, who were employees at the time, gave two-week notices and were allowed to serve out that time.

Plaintiff raises three claims for relief.  In Claim I, he alleges "discrimination in terms of employment" in which he alleges the following.  He was singled out for different treatment based on his race (black).  White employees were allowed to communicate with each other during off-duty hours and by telephone, some of whom had Zadel's telephone numbers and routinely communicated with her at home, but plaintiff was reprimanded for communicating with Zadel.  In addition, he was counseled for sending Zadel an e-mail in the regular course of business regarding a project.  Without any confirmation of the facts, and based upon an informal conversation she overhead among two white employees, Zadel reported to plaintiff's manager that plaintiff was not working regular hours.  "Zadel's conduct was intentionally to harass the Plaintiff based on his race, black, in his efforts to do his job."  (Docket No. 3 at 12, ¶ 57).  "All of Plaintiff's actions were inappropriate and done in the course of business, yet Zadel found fault with Plaintiff every actions."  (Docket No. 3 at 13, ¶ 58).  Plaintiff did nothing

to deserve the animosity, and he was warned that Zadel hated him.  Zadel singled him

out for ill treatment solely based on his race, and her conduct was done intentionally to

force plaintiff to quit or resign.  The harassment and disparate treatment by SG's

managers and employees was based upon his race.

In Claim II, concerning "traning" [sic], plaintiff alleges the following.  SG

intentionally denied him training that was provided to white persons similarly situated to

him, intentionally segregated him, and did not allow him to attend meetings or obtain

information necessary for him to perform his duties.  He was the only employee

excluded from training and not notified of meetings.  Plaintiff complained to the Human

Resources Department, but nothing was done.  His exclusion from meetings and denial

of training was done solely based upon his race.

In Claim III, plaintiff alleges that he was terminated or forced to resign based on

his race and that SG's managers' and employees' "harassment and disparate treatment

of Plaintiff was based upon his race, black." (Docket No. 3 at 16, ¶ 85).  He asserts the

following in Claim III.  He was told by a subordinate on or about May 1, 2010 [sic], that

she was replacing plaintiff in his position.  On the morning of May 15, 2008, plaintiff

received Saunder's e-mail titled "One-on-One" for 4:30 p.m. with nothing else in the

body of the e-mail.  Fearing an adverse action, plaintiff requested a "third neutral party

outside of HR or accounting to be present if he was being terminated or reprimanded."

Within two minutes, the meeting was moved to the office of Janet Eversman, Director of

Human Resources.  Plaintiff then went to West's office and stated he would rather

resign than be terminated.  West did not tell plaintiff he was not being terminated, but

plaintiff, believing he was being terminated at the pending meeting, e-mailed his

resignation.  Before his resignation, he was performing his job in a satisfactory manner.

In all three claims plaintiff alleges the following.  SG's "actions were exercised with malice and reckless indifference towards Plaintiff's federally protected rights." (Docket No. 3 ¶¶ 63, 73, 86).  SG "knowingly and willfully engaged in illegal employment practices and policies that have discriminated against Plaintiff because of his race." (Docket No. 3 ¶¶ 64, 74, 87).  "Such practices infringed upon Plaintiff's ability to perform his employment contract as well as subjecting him to racial discrimination, racial harassment and racially terms and conditions of employment because of his race." (Docket No. 3 ¶¶ 64, 74, 87).  "Such practices violated Title VII of the Civil Rights Act, as amended, 42 U.S.C. §§ 2000e *et seq*, and 42 U.S.C. § 1981."  (Docket No. 3, ¶¶ 64, 74, 87).  As a proximate result of SG's action, plaintiff has suffered loss of career advancement opportunities, emotional and mental injury, loss of self-esteem, and other injuries and losses.  (Docket No 3 ¶¶ 65, 75, 88).

Plaintiff seeks a permanent injunction preventing any employment practice by SG which discriminates on the basis of race, compensatory damages, back pay, reinstatement, or front pay in lieu of reinstatement, expungement of negative employment records from his personnel file, punitive damages for the malicious and reckless conduct, attorney fees, expert witness fees, and costs.

## DEFENDANT'S MOTIONS

Now before the court for a report and recommendation are the following two dispositive motions filed by the defendant: (1) Defendant's Motion to Dismiss and for Sanctions (Docket No. 73) and (2) Defendant's Motion for Summary Judgment (Docket No. 100).  Plaintiff, through counsel, filed a response to each motion (Docket Nos. 91

and 108), and defendant filed Replies (Docket Nos. 96 and 11).  The court has very

carefully considered all of the motion papers as well as the court's file and applicable

Federal Rules of Civil Procedure.  The court now being fully informed makes the

following findings, conclusions, and recommendations.

### Defendant's Motion for Summary Judgment

Defendant seeks the entry of summary judgment in its favor and against plaintiff

on all claims for relief because plaintiff allegedly cannot present sufficient evidence to

establish his *prima facie* case that SG discriminated against him because of his race or

that his working conditions were so intolerable that he had no other choice but to resign.

Defendant also seeks an order granting summary judgment on its affirmative defense of

after-acquired evidence based upon facts revealed during the course of discovery.

Rule 56(a) provides that summary judgment shall be granted "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party seeking summary

judgment bears the initial responsibility of informing the district court of the basis for its

motion, and identifying those portions of the pleadings, depositions, interrogatories, and

admissions on file together with affidavits, if any, which it believes demonstrate the

absence of genuine issues for trial."  Robertson v. Board of County Comm'rs of the

County of Morgan, 78 F. Supp.2d 1142, 1146 (D. Colo. 1999) (citing Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986); Mares v. ConAgra Poultry Co., 971 F.2d 492, 494

(10th Cir. 1992)).  "Once a properly supported summary judgment motion is made, the

opposing party may not rest on the allegations contained in the complaint, but must

respond with specific facts showing the existence of a genuine factual issue to be tried. .

10

. .  These facts may be shown 'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings by themselves.'" Southway v. Central Bank of Nigeria, 149 F. Supp.2d 1268, 1273 (D. Colo. 2001), aff'd, 328 F.3d 1267 (10th Cir. 2003). However, "[i]n order to survive summary judgment, the content of the evidence that the nonmoving party points to must be *admissible*. . . .  The nonmoving party does not have to produce evidence in a form that would be admissible at trial, but '"the content or substance of the evidence must be admissible."' . . .  Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is "not suitable grist for the summary judgment mill."'" Adams v. American Guarantee & Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000).

"Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response." Southway, 149 F. Supp.2d at 1273.  "The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . . .  Unsupported allegations without 'any significant probative evidence tending to support the complaint' are insufficient . . . as are conclusory assertions that factual disputes exist." Id.; Robertson, 78 F. Supp.2d at 1146 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); quoting White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir. 1995)). "Evidence presented must be based on more than 'mere speculation, conjecture, or surmise' to defeat a motion for summary judgment." Southway, 149 F. Supp.2d at 1274.  "Summary judgment should not enter if, viewing the evidence in a light most

11

favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party." Id. at 1273.

"Title VII prohibits discrimination on the basis of race, color, religion, sex, and national origin with respect to . . . compensation, terms, conditions, or privileges of employment, and discriminatory practices that would deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." Thompson v. North Am. Stainless, LP, 131 S. Ct. 863, 868 (2011) (internal quotations omitted). "Title VII . . . prohibits employers from using employment practices that cause a disparate impact on the basis of race (among other bases)." Lewis v. City of Chicago, Ill., 130 S. Ct. 2191, 2195 (2010). "Section 1981 forbids all intentional racial discrimination in the making or enforcement of private or public contracts. . . .  In particular, § 1981 protects employees from racial discrimination both in entering into an employment contract and in enjoying the benefits, privileges, terms and conditions of employment." Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1134 (10th Cir. 2004). "A plaintiff may prove violation of Title VII or 42 U.S.C. § 1981 – the standards are the same, . . . either by direct evidence of discrimination . . . or by adhering to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, . . . (1973)." Crowe v. ADT Sec. Servs., Inc., 649 F.3d 1189, 1194 (10th Cir. 2011) (citations omitted). Under that framework, "the plaintiff must first establish a prima facie case of discrimination . . . .  Then, the defendant may come forward with a legitimate, non-discriminatory . . . rationale for the adverse employment action.  If the defendant does so, the plaintiff must show that the defendant's preferred rationale is pretextual." Id. at 1195.

12

***Prima Facie* Case of Constructive Discharge.**   "A constructive discharge occurs when a reasonable person . . . would view [his] working conditions as intolerable and would feel that [he] had no other choice but to quit."   Narotzky v. Nartrona County Mem. Hosp. Bd. of Trustees, 610 F.3d 558, 565 (10th Cir. 2010) (quoting Tran v. Trustees of State Colleges in Colo., 355 F.3d 1263, 1270 (10th Cir. 2004)).   "In determining whether an employee's working conditions would cause such feelings in a reasonable person, [the court] appl[ies] an objective test under which neither the employee's subjective view of the situation, nor [his] employer's subjective intent with regard to discharging [him], are relevant."   Tran, 355 F.3d at 1270.   "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions."   Id.   "Further, conduct which meets the definition of a 'tangible employment action' or an 'adverse employment action' is not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable."   Id. at 1270-71.   "Courts evaluate the voluntariness of an employee's resignation using 'an objective, totality of the circumstances standard.'"   Green v. Potter, 2011 WL 2693523, at *3 (D. Colo. July 12, 2011) (quoting Fischer v. Forestwood Co., 525 F.3d 972, 980 (10th Cir. 2008)).   "The plaintiff has a substantial burden to prove a constructive discharge claim . . . ."   Narotzky, 610 F.3d at 565.   "Ultimately, '[a] resignation will be involuntary and coerced when the totality of the circumstances indicate [the lack of an] opportunity to make a free choice.'"   Id. at 566 (quoting Parker v. Board of Regents of Tulsa Jr. College, 981 F.2d 1159, 1162 (10th Cir. 1992)).

13

Here, defendant asserts that the plaintiff's only basis for constructive discharge is insufficient as a matter of law.  Defendant notes that in plaintiff's pleading, he claims that because he "believ[ed] he was being terminated" at a one-on-one meeting with his supervisor scheduled for the afternoon of May 15, 2008, and he had no other choice but to resign that morning.  (Docket No. 3 at ¶¶ 82, 84).  Such belief, according to defendant, was not only unreasonable, but it is not supported by plaintiff's own e-mail that day in which he stated, "If I am going to be fired *or reprimanded*," or by the e-mail in response from his supervisor, Stephen Saunders, which stated, "these meetings are going to take place monthly to make sure you are on track with where you need to be." (Def.'s Ex. E, Saunder's Aff. Ex. 7) (emphasis added).  Defendant contends that it is also relevant that the plaintiff was actively looking for employment outside of SG weeks before he gave his two-week notice.  According to defendant, the only purpose of the one-on-one meeting was to present plaintiff with a performance log, not to terminate him.  Defendant thus argues that plaintiff's unreasonable reaction to his supervisor's request to meet with him to discuss performance falls extremely short of the constructive discharge standard.

In response, plaintiff acknowledges that his "burden in establishing constructive discharge is substantial."  (Docket No. 108 at 10).  He further acknowledges that a constructive discharge occurs only "when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign."  Fischer v. Forestwood Co., 525 F.3d at 980. Nevertheless, plaintiff claims that the evidence shows that he had no choice but to resign and that several factors lead him to conclude that the May 15, 2008, meeting was

14

a discharge meeting.  First, on or about April 14, 2008, after Saunders gave him "written

discipline" in the form of a performance log, Saunders told plaintiff that Zadel "hated

him" and that plaintiff should start looking for another job.  Second, plaintiff allegedly

received "numerous disciplines," namely, being "reprimanded" for banker's hours and

was "repeatedly counseled and reprimanded" by Saunders for interpersonal office

contacts.  Third, all of his duties and responsibilities were taken from him when

Candrian was hired, and on May 6, 2008, plaintiff observed Saunders having a private

meeting with Candrian after which on the following day, Candrian told him that she was

to assume all responsibilities in the department, according to Saunders.  Plaintiff claims

Saunders' and Candrian's remarks were not stray remarks because Saunders made the

remarks to plaintiff three weeks before "the discharge occurred."  Fourth, plaintiff was

excluded from critical training necessary to perform his job fully.  Finally, Saunders kept

information from plaintiff on assignments and tasks to he could not meet deadlines and

made it appear plaintiff was not doing his job.

Plaintiff notes that after he received Saunders' e-mail indicating a one-on-one

meeting at 4:30 that day, he responded stating that if he was being terminated or

disciplined, he wanted a neutral third party present for the meeting.  Within two minutes

of plaintiff's e-mail, Saunders moved the meeting to the office of Janet Eversman, which

is in the Human Resources Department.  Plaintiff claims that at the time, he believed

that Eversman was the one who conducted terminations.  Plaintiff claims he then went

to VP West's office and told her he did not deserve to be terminated, but if he was about

to be terminated, he would rather resign instead.  He also allegedly told West that

weeks earlier Saunders had told him to start looking for a job, and that Candrian had

15

told him that she was replacing him.  Plaintiff claims he told West that someone would

have to have a profound learning disability to not see what was going on.  West,

however, allegedly made no comment, other than stating something like "Well, this tells

me that you can't get along with your manager" (Docket No. 100-1 at 35, Pl.'s Dep. Tr.

at 340:2-17), and plaintiff contends "that West by her silence confirmed that he was

being terminated."  (Docket No. 108 at 10).  Plaintiff further argues that "his resignation

was a mere formality.  It was clear to Plaintiff that he could go to the meeting and be

terminated or that he could resign prior to the meeting."  (Docket No. 108 at 10).

        Based on this court's review of the record, this court concludes that the

defendant is entitled to summary judgment on plaintiff's constructive discharge claim.

This court finds based upon the totality of the circumstances, plaintiff has not met his

substantial burden because he has not alleged facts or shown that his working

conditions were so intolerable and/or that the actions by SG created a situation in which

a reasonable person in his position would feel forced to resign and that there was a lack

of an opportunity to make a free choice.  See Tran, 355 F.3d at 1271.  Significantly, as

noted by the defendant, after plaintiff e-mailed Saunders that he wanted a neutral party

present if he was being terminated *or reprimanded* (Docket No. 100-2 at 23), Saunders

replied via e-mail, stating not that plaintiff was going to be reprimanded or terminated,

but merely that "these meetings are going to take place monthly to make sure you are

on track with where you need to be."  (Docket No. 100-2 at 24).  Such response

referring to future monthly meetings about future performance would not lead a

reasonable person to believe that he was about to be terminated.  Furthermore, VP

West's silence or mere comment that "[w]ell this tells me that you can't get along with

your manager" in response to plaintiff's alleged statements, i.e., that he would rather

resign rather than be terminated, which plaintiff made to West in her office right after

Saunder's e-mails that morning, are inconclusive and do not indicate one way or the

other whether plaintiff was about to be terminated.

Also, despite plaintiff's claim that he received "numerous disciplines," he has

shown only two performance logs.  In addition, as asserted by defendant, despite

plaintiff's assertion that he was denied the training and information required to perform

his job, he admits that he was never reprimanded for his lack of training or as a result of

to the failure to provide him information (Def.'s Ex. A to Reply, Pl. Dep. Tr. at 138:10-

140:7), and moreover, he did eventually participate in SAP training.

Also, even assuming Saunders did informally advise plaintiff that he might want

to look for a new job, that purported conversation occurred at least a month before

plaintiff's resignation, after which plaintiff would have had the choice of improving his

behavior or facing the possibility of consequences.  In addition, with regard to the

"banker's hours" chain of events, plaintiff himself states in his pleading that Saunders

stated he did not believe that plaintiff was coming in at nine and leaving at four, and he

advised plaintiff that Zadel had heard the allegations from others.  Furthermore, Zadel

(who relayed to Saunders the "banker's hours" rumor and according to plaintiff allegedly

said to Saunders that she hated plaintiff) was not even plaintiff's supervisor.  Moreover,

plaintiff was not disciplined for working "banker's hours."  His performance log shows

that it was written not as a result of the hours he was working but as a result of plaintiff's

reaction to being advised by Saunders of what Zadel told him she had heard.  See

Docket No. 100-2 at 17 ("The call from Cameron to a Manager in the organization to

whom he does not report, after hours, to a person cell phone, with the tone of the conversation are all unacceptable for an employee of SourceGas.").

In sum, this court finds that the plaintiff has not alleged or shown facts sufficient to support a *prima facie* case for constructive discharge.

**Exhaustion of Remedies Regarding Training Claim.**  Defendant next correctly asserts that although plaintiff's Complaint alleges discrimination claims based on a lack of training opportunities, no facts were alleged in his Charge of Discrimination to that indicated that the plaintiff was advancing a discrimination theory based on a lack of training.  (Docket No. 3 at ¶¶ 67-71; Docket No. 100-6 at 2, Def.'s Ex. F - Charge of Discrimination).  A plaintiff must file a charge concerning each discrete act of alleged discrimination before proceeding with a claim in federal court.  Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003).  Since plaintiff did not do so with respect to his claim concerning training, summary judgment should enter for the defendant on the plaintiff's Title VII training claim contained in Claim II.  Plaintiff, however, correctly responds that his pro se Complaint alleges violations of both Title VII and 42 U.S.C. § 1981 and that § 1981 does not require exhaustion.  See Johnson v. Railway Exp. Agency, Inc., 421 U.S. 454, 460 (1975) ("[T]he filing of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites for the institution of a § 1981 action."); Felix v. City & County of Denver, 729 F. Supp.2d 1242, 1254 (D. Colo. 2010) ("A § 1981 plaintiff is not required to comply with the same pre-suit exhaustion requirements imposed on Title VII plaintiffs.").  Therefore, summary judgment cannot enter for the defendant on the plaintiff's § 1981 training claim on this ground.

**Racial Discrimination Claim.**  Defendant next asserts that the plaintiff cannot

establish a *prima facie* case of racial discrimination (both under Title VII and 42 U.S.C. § 1981).  Since in this case the plaintiff has offered no direct evidence of discrimination, he must first establish a *prima facie* claim of discrimination based on race.  To do so, he must present evidence that (1) he belongs to a protected class, (2) he suffered an adverse employment action, and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination."  See E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007).[1]  Here, defendant asserts that plaintiff has not met his burden of setting forth sufficient evidence regarding elements two and three and has not established "that the defendant had a discriminatory intent or motive" for taking a job-related action.  Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986 (1988).

**Adverse Actions.**  First, defendant contends that none of the allegations of disparate treatment/discrimination rise to the level of an "adverse action."  The Tenth Circuit has "liberally define[d] the phrase 'adverse employment action,' . . . and takes 'a case-by-case approach, examining the unique factors relevant to the situation at hand[.]'"  E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1040 (10th Cir. 2011) (internal citations omitted).  "In general, [o]nly acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in

---

[1]The Tenth Circuit Court of Appeals, however, has noted that in PVNF it noted that "[t]here exists some tension in our case law regarding what a plaintiff must establish as part of his or her prima facie case of discrimination.  Some cases treat circumstances suggestive of discrimination as an element of a prima facie case; other cases treat the surrounding circumstances as part of the analytically subsequent inquiry into the employer's stated reason for the challenged action and the plaintiff's opposing demonstration of pretext."  Luster v. Vilsack, 2011 WL 6000545, at *5 n.1 (10th Cir. Dec. 1, 2011) (quoting PVNF, 487 F.3d at 800 n.5).

19

benefits will rise to the level of an adverse employment action." Id. (internal quotations

omitted).  "However, the term 'adverse employment action' is not necessarily 'limited to

such acts[,]" but the "plaintiff must show that the alleged adverse action caused more

than '*de minimis* harm' to or a '*de minimis* impact' upon an employee's job opportunities

or status." Id.  "Requiring this level of adversity . . . is necessary to separate significant

from trivial harms . . . ., petty slights, minor annoyances, and simple lack of good

manners[.]" Johnson v. Weld County, Colo., 594 F.3d 1202, 1216 (10th Cir. 2010)

(internal quotations and citations omitted).  See James v. Booz-Allen & Hamilton, Inc.,

3t8 F.3d 371, 377 (4th Cir. 2004) ("mere dissatisfaction with work assignments, a feeling

of being unfairly criticized, or difficult or unpleasant working conditions are not so

intolerable as to compel a reasonable person to resign").

     In this case, plaintiff claims he was subjected to discrimination based upon

(1) his being "reprimanded for communicating with Patty Zadel where other white

employees had her telephone numbers and on information and belief routinely

communicated with her at home" (Docket No. 3 ¶ 54) and reprimanded for leaving a

voice-mail message for another employee, Trent Bachelor, that same weekend for

which a performance log was written; (2) reprimanded for certain e-mails to other

employees (Cheri Ellis and Ann Hayworth) for which a performance log was written, and

(3) denied training opportunities.  (Docket No. 100-1 at 30, Pl.'s Dep. Tr. at 295:17-25,

296:1-4).

     Regarding the first item, Saunders (plaintiff's supervisor at SG) states in his

affidavit that on April 11, 2008, Patty Zadel (former Manager of Budgeting and

Forecasting) contacted him about a rumor she heard about plaintiff working "banker's

20

hours," and Saunders met with plaintiff the same day and let him know "that even
though he and his friends might joke around about these things, such comments can be
mistaken or misinterpreted." (Docket No. 100-5 at 3, ¶ 5). Saunders was subsequently
contacted by Zadel regarding a message left by plaintiff around 7 p.m. that evening on
the voice mail connected to Zadel's private cell phone number. Saunders listened to
that voice mail in which Saunders states plaintiff "stated that he needed to talk to Ms.
Zadel before Monday and that she should have never gone to his boss without first
speaking to him. He also stated that he faithfully works 40 hours a week. The tone of
the voice mail message, however, was confrontational and very defensive." (Docket
No. 100-5 at 3, ¶ 6). According to Saunders, he was then approached on Monday, April
14, 2008, by Trent Bachelor (tax accountant for SG) who had also received a voice mail
message from plaintiff. Saunders listened to the message and determined that the tone
was threatening. (Docket No. 100-5 at 3, ¶ 7). Saunders states he "counseled" plaintiff
about his interactions with Zadel and Bachelor and confirmed their meeting discussions
in another performance log signed by plaintiff, Marilyn West (VP of Accounting), and
Saunders. (Docket No. 100-5 at 3, ¶ 8; Performance Log - Docket No. 100-2 at 16-17
and Docket No. 100-5 at 12-13).

The court notes that the Action Plan that is at the end of the performance log
includes the statement that "[a]ny interaction, emails, or other contact that is deemed by
Management to be in violation of these terms will be grounds for immediate termination
of employment." (Docket No. 100-2 at 17). In addition, plaintiff testified at his
deposition that he did not read that performance log before he signed it "[b]ecause I felt
the whole issue at that point was blatantly asinine, racist, and retaliatory on the part of

Patty Zadel, and that Steve Saunders was more than happy to soak it up and roll with it." (Docket No. 100-1 at 22, Pl. Dep. Tr. at 224:11-14). He further stated that "it was pretty clear to me what was going on, and I was so disgusted with Stephen Saunders and Marilyn West and Patty Zadel that I had no desire whatsoever to waste three minutes or two minutes to read this so-called performance log." (Docket No. 100-1 at 23, Pl. Dep. Tr. at 225:6-11). In response to "what evidence do you have that Patty Zadel's reaction was motivated by your race," plaintiff stated, "[b]ecause there was nothing I said in the phone call that was personal, threatening, or in any way, shape, or form insubordinate or out of line." (Docket No. 100-1 at 29, Pl. Dep. Tr. at 290:10-20). Plaintiff, however, has never heard Zadel make derogatory comments about plaintiff's race. (Docket No. 100-1 at 29, Pl. Dep. Tr. at 290:17-20).

With regard to item number two, Saunders states in his affidavits that during January through March 2008, employees brought to his attention e-mails they had received from plaintiff, and because of the "unprofessional tone" of the e-mails, he "counseled" plaintiff about his conduct on March 19 and 24, 2008, which was confirmed in a performance log that was reviewed with and signed by plaintiff. (Docket No. 100-5 at 2, ¶ 3). One of those e-mails from plaintiff reads, "I loaned you a DVD a few weeks back and I would like to loan it to someone, and the thought of you having my property makes my blood boil. So, if you could drop it by my desk without as much as a syllable being uttered, that would be great." (Docket No. 100-5 at 7). Another reads, "Cheri....I can't stress this enough: I have zero interest in this conversation, and I surely do not and will not have it in writing. I know you think I'm a dim bulb, but I am not. In short, you have undermined me (daily), you have shown nothing short of lack of respect

22

towards me, and I can go on and on and on.....  That is all moot now."  (Docket No. 100-5 at 6).  That was in response to an e-mail from Cheri Ellis which stated: "I feel very alienated from you this week, Cameron.  I thought, perhaps incorrectly, that we had a friendship as well as being coworkers.  You seem very distant and cool towards me and it hurts me because I care about you.  The fact that you think that there is nothing to talk about seems strange to me too.  Am I imagining this or have you had a change of heart towards me?"  (Docket No. 100-5 at 6).

With regarding the third item, defendant correctly notes that plaintiff admitted during his deposition that any alleged lack of training never resulted in any reprimand or adverse action.  He also confirmed that he was allowed to participate in the SAP training "right before the rollout" in April 2008.

The court finds that none of the alleged actions, individually or collectively, constitute an adverse employment action.  As defendant correctly asserts, being reprimanded or disciplined for inappropriate behavior in the workplace may have made the plaintiff unhappy, but it did not affect the terms, conditions, or privileges of his employment.  "[N]ot everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."  MacKenzie v. City and County of Denver, 414 F.3d 1266, 1279 (10th Cir. 2005) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)).  Plaintiff testified that the only "discipline" he ever received during his employment were the two performance logs.  (Docket No. 100-1 at 30, Pl. Dep. Tr. at 295:12-16).  However, "[p]lacement on a performance plan or a negative review 'standing alone, is not an

23

adverse employment action.'" Paige v. Donovan, 2011 WL 5520298, at *7 (D. Colo.

Nov. 14, 2011) (quoting Haynes v. Level 3 Comms., LLC, 456 F.3d 1215, 1224 (10th Cir.

2006)).  Here, there has been no showing that the "performance logs," even the log

which cautioned about future infractions possibly resulting in termination, and/or the

verbal counseling/reprimands (whichever way they are viewed) "effect[ed] a significant

change in the plaintiff's employment status," Haynes, 456 F.3d at 1224-25, and thus did

not constitute adverse actions.  See Tapia v. City of Albuquerque, 2006 WL 308267, at

*4 (10th Cir. Feb. 10, 2006) (Letter of instruction did not constitute adverse employment

action.  It did not affect his pay, benefits, or employment status.  Plaintiff continued to

work for defendant after receipt of letter and unrealized threat that plaintiff could be

disciplined for future infractions was not enough to make the letter itself an adverse

action.); Rennard v. Woodworker's Supply, Inc., 2004 WL 1260309, at *10 (10th Cir.

June 9, 2004) (Affirming grant of summary judgment on retaliation claim based on

written reprimand despite the fact that reprimand expressly stated that future infractions

could result in termination.  It was undisputed that defendant took no further action

against plaintiff in connection with the reprimand, and thus plaintiff showed no

immediate or practical effect on her job status.).  "[U]nsubstantiated oral reprimands . . .

such as those alleged here are not included within the definition of adverse action

absent evidence that they had some impact on the employee's employment status."

Sanchez v. Denver Pub. Schools, 164 F.3d 527, 533 (10th Cir. 1998) (quotations

omitted).

        In sum, this court finds that the plaintiff has not demonstrated that the few

counseling/reprimands, delayed training, failure to include him in meetings, etc., had

24

any meaningful impact on his employment opportunities or status and thus do not

separately or in the aggregate constitute an adverse employment action.  Therefore,

plaintiff has not established a *prima facie* case of racial discrimination.

**Actions Occurring Under Circumstances Giving Rise to an Inference of**

**Discrimination.**  Defendant also asserts that plaintiff has not shown that the alleged

actions occurred under circumstances giving rise to an inference of discrimination.

According to defendant, plaintiff has not shown that similarly-situated employees were

treated differently.  More specifically, plaintiff  has not identified any "white" employees

who contacted Zadel on her personal cell phone and were not counseled about their

actions (Docket No. 100-1 at 30, Pl. Dep. Tr. at 293:12-15), nor has he identified any

individuals who were treatment more favorably than him during his employment,

including with respect to his lack of training allegations.  (See Def.'s Ex. G, Pl.'s Resp.

to Interrog. No. 9).  Since the plaintiff has not set forth any specific facts that similarly-

situated employees were treated differently from him, summary judgment is allegedly

appropriate as to his disparate treatment claim.

Furthermore, defendant notes that the plaintiff admits that he never heard any of

his supervisors or managers make any derogatory remarks about race.  Plaintiff stated

at his deposition that no racially-derogatory comments were directed toward him during

the five-month period during which he claims he was subjected to abusive behavior.

(Docket No. 100-1 at 37, Pl.'s Dep. Tr. at 345:10-13).  In particular, the court notes that

the plaintiff testified during his deposition that Karen Walthall never made any

derogatory comments about plaintiff's race, but he based his answer that she was

probably interacting with him because of his race based on "Nuance.  Her interaction."

25

(Docket No. 100-1 at 31, Pl.'s Dep. Tr. at 301:3-14).  In addition, he said that Ann

Hayworth and Cheri Ellis did not direct any racially-derogatory comments at him.

(Docket No. 100-1 at 31, Pl.'s Dep. Tr. at 301:15-25, 302:1-3).  He also never heard

Patty Zadel make any racially-derogatory comments, but he thinks she is a racist

because he never wronged her and was never insubordinate or unprofessional.

(Docket No. 100-1 at 31; Pl.'s Dep. Tr. at 303:12-20).  Plaintiff also admitted that he

never told anyone at SG that he thought he was being subjected to race discrimination.

(Docket No. 100-1, Pl.'s Dep. Tr. 196:8-15).

Defendant asserts that plaintiff's own subjective feelings of race discrimination,

without more, is insufficient to create a material issue of fact.  "Unsupported allegations

without 'any significant probative evidence tending to support the complaint' are

insufficient."  Southway, 149 F. Supp.2d at 1273.

In response, plaintiff asserts:

Plaintiff establishes his burden by stating that he was the only Black
employee at the Lakewood Office.  Plaintiff has alleged racial harassment
in the verbal reprimands reprimand [sic] for "banker's hours," and the
performance logs issued by Saunders. . . .  Plaintiff alleges that
reprimands and disciplines were the result of White females insinuated
"fear of a Black man" and that he, a Black man, treated White Females
inappropriately. . . .  Plaintiff's email interactions with Cheryl Ellis showed
that the Plaintiff declined an invitation for "after work drinks."  When Ellis
persisted, the Plaintiff was more forceful in his rejections. . . .  Likewise the
dispute with Karen Wathal involved a loaned DVD. . . .  Saunders
counseled the Plaintiff for emails to Ellis and Wathal regarding purely
personal matters.  Zadel made an unfounded allegation that the Plaintiff
was keeping "bankers hours."  Yet when Plaintiff confronted Zadel about
the unfounded allegations, the Plaintiff was issued a performance log that
threatened termination.  The Plaintiff was adversely affected by theses
[sic] verbal reprimands and written performance logs.  Plaintiff has
asserted that Ellis and Wathal were not disciplined for the same incident.
Moreover, Plaintiff has asserted that Patty Zadel was abrasive to
employees and received no discipline.

(Docket No. 108 at 17-18).

This court finds that even when the facts and inferences are viewed in the light most favorable to plaintiff, plaintiff has not demonstrated a *prima facie* case because he has presented no evidence that any of the complained of actions occurred under circumstances giving rise to an inference of discrimination.  There is absolutely no evidence that any of defendant's actions were done as a result of plaintiff's race or that similarly-situated employees received more favorable treatment.  Instead, plaintiff's claims are based solely on "speculation, conjecture, and surmise" and his subjective feeling that the actors are racists, which are inadequate to defeat a motion for summary judgment.  "Unsubstantiated allegations carry no probative weight in summary judgment proceedings.  To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875 (10th Cir. 2004).  No rational juror could infer from the evidence that the defendant's actions were motivated by plaintiff's race.  "Vague, conclusory statements do not suffice to create a genuine issue of material fact."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 674 (10th Cir. 1998).

In sum, this court agrees with defendant that summary judgment should be granted in favor of the defendant.  There is thus no need to address defendant's affirmative defense alleging after-acquired evidence.

## Defendant's Motion to Dismiss and for Sanctions

In its Motion to Dismiss and for Sanctions (Docket No. 73), defendant requests that the court rely on its inherent power to ensure respect for the judicial process and the law and dismiss this case in its entirety and enter sanctions against the plaintiff for

his allegedly egregious conduct during discovery in this case.  More specifically,

defendant asserts the following.

"Since the inception of the case, [the plaintiff] has engaged in a pattern of

discovery abuses involving (1) material discovery omissions; (b) blatant dishonesty; (c)

slurs and insults to Defendant and defense counsel; (d) threats to personally sue

defense counsel and defense counsel's firm; and, most egregiously, (e) a physical

assault of defense counsel during Plaintiff's deposition."  (Docket No. 73 at 1-2).

According to defendant, plaintiff physically assaulted defense counsel, David D. Powell,

Jr., Esq., during plaintiff's continued deposition on July 11, 2011, in this court's jury

room, repeatedly striking him in the face and body and ripping his dress shirt.  At the

end of the alleged attack, plaintiff purportedly shouted, "You got your ass kicked

good–didn't you!" and promptly fled the jury room and courthouse before the U.S.

marshals were able to respond.  The deposition was being conducted in the courthouse

after SG learned of plaintiff's numerous criminal convictions involving violence, including

a 2010 case involving death threats against an SG employee.  The attack was

witnessed by plaintiff's counsel, the court reporter, and the videographer, each of whom

provided statements to a Federal Protective Services investigator.

After the attack, defense counsel obtained a temporary civil restraining order

against the plaintiff.  Plaintiff failed to appear at a July 22, 2011, hearing to make the

order permanent.  After the issuance of the temporary restraining order, plaintiff called

defense counsel's office, spoke with the firm's administrator, Cheryl Passini, and told

her he was "going to sue Dave Powell" and that he was "going to sue [Ms. Passini] too."

Immediately preceding and following that call, defense counsel's office felt forced to

implement enhanced security measures, including keeping all doors locked at all times.

During the pendency of this action, SG has likewise felt forced to undertake its own

enhanced security measures at its corporate offices due to plaintiff's violence and

threats of violence toward two SG employees who obtained restraining orders.

During plaintiff's deposition, in an angry tone, plaintiff referred to SG as a "racist

piece of shit company filled with liars and bigots" and called defense counsel "Chairman

Steele," apparently comparing counsel to Chairman Michael Steele of the Republican

National Committee.  The transcript reads as follows:

> MR. ALSTON: What is the question?
> (Whereupon, the following record was read back by the court reporter:
> "What are your concerns about SG and me?")
> THE DEPONENT: My concerns about you is that you work for a racist
> piece of shit company like SG, that is filled with liars and bigots.  And I
> wonder how you can look yourself in the mirror every day, Chairman
> Powell.  Or should I say Chairman Steele?
> Q.  (By Mr. Powell) Chairman Steele?
> A.  You're a pretty good [aesthetic for SourceGas]-
> Q.  Who is Chairman Steele?
> A.  You figure it out.

Def.'s Ex. D, Pl.'s Dep. Tr. at 59:12-60:11.

In addition, according to defendant, plaintiff made material omissions and was

blatantly dishonest in his written discovery responses and during his June 7, 2011, and

July 11, 2011, depositions.  More specifically, defendant asserts the following.  Plaintiff

lied about his employment history and prior claims.  In Defendant's First Set of

Discovery Requests to Plaintiff, plaintiff was asked in Interrogatory No. 4 to identify "all

employers with whom [he was] employed since high school through the present and in

Interrogatory No. 5 to identify whether he had "ever filed an EEOC or Colorado Division

of Civil Rights Commission charge, complaint with any federal or state agency, or ever

been party to a lawsuit other than this action."  In his answer to Interrogatory No. 4, he

did not list Murrayhill Company, and he answered "no" to the latter question.  Both

plaintiff and his attorney, Mr. Alston, signed the responses.  During plaintiff's June 7,

2011, deposition, he was asked about his employment history and former charges or

suits:

> Q.  So my question is: Have you brought any prior lawsuits against other companies? Yes or no?
> A.  Yes.
> Q.  Okay.  What companies?
> A.  The Murrayhill Company.
> Q.  Murrayhill?
> A.  That's correct.
> . . .
> Q.  Did you actually hire an attorney to sue the company?
> A.  I did.
> Q.  Who was the attorney you hired?
> A.  Nelson Alston.
> . . .
> Q.  Okay.  And when I asked you for your employment history this morning, you didn't mention Murrayhill, did you?
> A.  No.
> . . .
> Q.  So you didn't list Exempla and you didn't list Murrayhill.  Are there any other employers that you worked for within the 10-year time frame that you didn't list on your application?
> A.  Perhaps.  Possible.
> Q.  So why do you say that?  How many employers did you work for after you graduated from CU and before you started at Webster?
> > A.  I have no idea.
> > Q.  You're sure there are no other ones?
> A.  No, I'm not sure.
> Q.  So you don't know.  You think you may have worked for other companies besides Exempla and Murrayhill?
> A.  I don't know.  It's possible.

(Def.'s Ex. D, Pl. Dep. Tr. at 60:23-64:2; 67:16-19; 208:21-209:10).  When questioned,

plaintiff admitted to both being employed by and terminated from Murrayhill and filing a

race discrimination claim against it.  (Def.'s Ex. D, Pl. Dep. Tr. at 60:23-64:2; 67:16-19).

30

Defendant asserts that "[n]otwithstanding Plaintiff's vague and evasive testimony about the existence of other prior employers (and possibly other claims), the record is clear that Plaintiff made material omissions from his written discovery responses and testified untruthfully about his prior employment and claims."  (Docket No. 73 at 7).

In addition, defendant asserts that plaintiff lied about his criminal history.  He was asked in Defendant's First Set of Discovery Requests to Plaintiff in Interrogatory No. 8 to identify "any and all arrests, convictions, pleas, or other disposition of any crime or alleged crime with which you have been involved, except for parking tickets."  (Def.'s Ex. E).  Plaintiff responded with "See Attachment F," which disclosed only three criminal cases: (1) Case No. 09GS153452, *People v. Cameron McArthur* (threats); (2) Case No. 01GS940451, *People v. Cameron J. McArthur* (assault); and (3) Case No. 000S224673, *People v. Cameron J. McArthur*, (urinating in public).  (Def.'s Ex. G).  When asked during his June 7, 2011, deposition about his criminal history and the information he disclosed on his SG employment application, plaintiff stated:

> Q.  Okay.  So you do understand what it means to plead guilty to
> something?
> A.  I haven't pled guilty to anything, Mr. Powell.
> Q.  You've never pled guilty to anything?
> A.  That's correct.
> Q.  Really?
> A.  Really.
> Q.  But you've been found guilty of some things, correct?
> A.  I never pled guilty.
> Q.  Never ever?
> A.  What did I just say, sir?  I don't understand --
> Q.  Well, I just want to make sure.  You've never pled guilty to anything?
> A.  That's correct, Mr. Powell.

(Def.'s Ex. D, Pl. Dep. Tr. At 74:18-77:22).  Records obtained by SG, however, show plaintiff omitted the following prior civil and criminal history: (1) Case No. 1997M201295,

31

*People v. Cameron J. McArthur*, County Court, Arapahoe County, Colorado (drugs); (2)

Case No. 810GT9904118101, *People v. Cameron J. McArthur*, Virginia Beach General

District Court, Virginia (reckless driving; capias - failure to appear); (3) Case No.

2000C4164, *Centra Credit Corp. v. Cameron J. McArthur*, District Court, Adams County,

Colorado (money); (4) Case No. 2009C1630, *People v. Cameron Jordan McArthur*,

District Court, Jefferson County, Colorado (restraining order; domestic abuse); (5) Case

No. 2010CV826365, *Colorado Department of Revenue v. Cameron J. McArthur*, District

Court, City and County of Denver (restraint warrant); and (6) Case No. 2010CR000491,

*People v. Cameron McArthur*, District Court, Jefferson County, Colorado (stalking,

threats, harassment).  (Def.'s Ex. H).  According to defendant, the certified copy of Case

No. 01GS940451 directly contradicts plaintiff's deposition testimony that he never pled

guilty to any law violation.  (Def.'s Ex. H at 2).

Furthermore, defendants assert that plaintiff lied about his prior psychological

treatment and counseling as set forth below.   Plaintiff seeks damages for emotional

distress in this case, and during his deposition, he denied having received any

treatment, other than as a child, during college, and the counseling and medication he

received from Susan Kamler, LPC, and Dr. Sarah Markey, with MDS Counseling Center

starting in January 2009 (subsequent to his leaving SG).  (Citing Def.'s Ex. D, Pl. Dep.

Tr. at 28:25-29:23; 356:20-357:7; 377:10-19; 384:1-3 ("I wasn't in therapy prior to [SG],

sir, and since college.").  However, Dr. Kamler's initial evaluation report provides that

plaintiff told her 4.5 years ago that he was "in counseling on and off for 2-3 years and

found it helpful.  He was prescribed alprazolam (Xanex) and Lexapro, and began feeling

better so stopped therapy and medication."  (Def.'s Ex. I at 2).  Defendant maintains that

plaintiff's "medical records regarding his prior treatment prove another lie under oath during this proceeding regarding his prior psychological treatment and counseling." (Docket No. 73 at 9).

In addition, defendant asserts that plaintiff's overall behavior during his depositions warrants sanctions, claiming that plaintiff repeatedly engaged in vague, evasive, and incomplete answers to legitimate questions, and exhibited angry outbursts. Defendant asserts that its "background investigation is ongoing; however the only logical explanation for the differences between Plaintiff's testimony and Exhibits E-I is that Plaintiff has been blatantly dishonest, under oath, about his employment history, prior claims, civil and criminal history, and psychological treatment and counseling." (Docket No. 73 at 9-10).

Defendant contends that the severity of plaintiff's misconduct during discovery warrants dismissal of his claims with prejudice.  Defendant asserts that the relevant factors for dismissal under Fed. R. Civ. P. 11, 37, and 41(b) are essentially the same and include: (1) the degree of actual prejudice to the opposing party; (2) the amount of interference with the judicial process; (3) the litigant's culpability; (4) whether the litigant was warned in advance that dismissal was a likely sanction; and (5) whether a lesser sanction would be effective.  Ehrenhaus v. Reynolds, 965 F.2d 916, 921 (10th Cir. 1992).  Defendant argues that plaintiff's violent and harassing behavior during his deposition, which was to take place in this courthouse due to his repeated violent criminal history, "evidences a complete lack of respect for the Court, Defendant[] and the judicial process."  (Docket No. 73 at 11) (quoting Stine v. United States, 2008 WL 2622766, at *11 (D. Colo. June 24, 2008)).  Defendant asserts:

Here, SG has been severely prejudiced by the behavior of McArthur, and particularly, the assault and threats to defense counsel. SG and defense counsel have both had to expend unnecessary resources and time to implement enhanced security measures, obtain restraining orders, and file the instant motion. McArthur's conduct has likewise interfered with the judicial process, as the Court and U.S. Marshal Service have also been burdened, including but not limited to, investigating and taking appropriate action following McArthur's attack on defense counsel at the federal courthouse, his subsequent flee from the scene, imposing necessary security measures and precautions for future appearances by McArthur in Court, and repairing the physical damage to the Court's jury room drywall that resulted from the attack.

McArthur's actions speak for themselves. It is clear that McArthur believes he can intimidate both SG and defense counsel with his violent behavior and threats, and further, that he believes he is immune to repercussions for lying under oath, rather than participate in good faith in the discovery process and allow the case to be resolved on the merits. No sanction less than dismissal with prejudice would be effective in this case. McArthur is represented by counsel and has extensive familiarity with the court system. There is simply no excuse for his abuses here. Accordingly, McArthur's violent, abusive and harassing behavior warrant dismissal of his lawsuit with prejudice.

(Docket No. 73 at 11-12).

Defendant further maintains that plaintiff's intentional misrepresentations and material omissions during discovery provide a separate and independent basis for sanctions and dismissal of this case with prejudice. Defendant asserts that plaintiff "signed his Discovery Responses, which contained the material omissions and false information discussed above. Moreover, in cases of repeated perjury, as is the case here, dismissal is the only sanction that will effectively punish the offending party (Plaintiff) and protect the integrity of these proceedings." (Docket No. 73 at 12).

In a footnote, defendant asserts that:

Pursuant to Fed. R. Civ. P. 37(b), the Court should, at a minimum, impose a combination of sanctions against Plaintiff, including but not limited to, monetary sanctions for: 1) the fees and costs incurred by Defendant to

> prepare for and depose Plaintiff; 2) the fees and costs incurred by
> Defendant to prepare and file the present motion; and 3) any additional
> monetary relief justified under the circumstances, as well as striking
> Plaintiff's request for front pay, his claim for emotional distress, and any
> award of back pay after April 8, 2011 (the date Plaintiff's Discovery
> Responses were due, and if responded to honestly, would have provided
> information about Plaintiff's material misrepresentations on his
> employment application about his criminal history and termination from
> prior employment).

(Docket No. 73 at 15 n.3).

In response, plaintiff asserts the following. The discovery infractions do not justify dismissal as a sanction. Regarding the physical altercation, plaintiff cites the Fifth Amendment. In response to Interrogatory Nos. 4 and 5, plaintiff failed to list a charge of discrimination he filed against a former employer, MurrayHill, because the charge had been resolved through a confidential settlement, but he volunteered the information at his deposition and stated that he had not listed it because it had been resolved through a confidential settlement. Even had he left that company off of his written interrogatory responses, he voluntarily clarified and supplemented the response at his deposition. That company is now out of business, and but for his voluntary disclosures, defendant likely would have never known of the omission. His culpability for these omissions is mitigated by his attempts to honor the confidential mediation agreement in the MurrayHill matter. He testified honestly at his deposition and corrected any misrepresentation contained in his interrogatory responses. Regarding his criminal history, he did submit an incomplete list, and defendant's Exhibit H at 2, regarding Case No. 01GS94045, does establish that plaintiff testified falsely at his deposition when he stated that he had never "pled guilty" to anything. However, a lesser sanction than dismissal for application falsification exists, such as altering the back pay period.

35

Regarding his prior psychological treatment and counseling, contrary to defendant's contention, plaintiff did not assert an "emotional claim" against SG.[2] Further, while defendant contends that plaintiff failed to provide a complete answer at his deposition regarding his prior history of treatment, he did designate Sue Kamler as his treating therapist, and consented and released her treatment records containing the information on his prior treatment history. Defendant cannot show any prejudice because plaintiff through his therapist had released the missing information on his history treatment and thus cured any misrepresentation made at his deposition. Here, "[p]laintiff cured misrepresentations in his interrogatories at his deposition and misrepresentations at his deposition were cured by other documents." (Docket No. 91 at 6). There is no evidence that he "willfully" withheld any information, and to the contrary, he clarified and supplemented the record. Finally, plaintiff admits he engaged in inappropriate name calling during the June 7, 2011, deposition, but his comments were made after the defendant and defense counsel pressed the plaintiff into making the statement. Furthermore, defense counsel is without clean hands because he taunted and threatened plaintiff and also engaged in name calling, i.e, on several occasions made the remark, "You think it funny don't you?" and referred to the plaintiff as a "two time convicted felon." "Plaintiff's conduct clearly was inappropriate. Mr. Powell's conduct, if not inappropriate, certainly scaled the line of appropriateness. Any criticism or sanction for the Plaintiff's insulting remarks should be mitigated by the borderline behavior of Mr. Powell." (Docket No. 8 at 9).

---

[2]In all three claims, plaintiff claims, *inter alia,* "emotional and mental injury, lose [sic] of self-esteem." (Docket No. 3 at ¶¶ 65, 75, 88).

36

In reply, defendant asserts the following.  Plaintiff has presented no compelling reason why the court should not sanction plaintiff for his egregious discovery abuses and conduct, up to and including dismissal of this action.  Rather, plaintiff attempts to hide behind the Fifth Amendment to avoid responding to defendant's arguments.  He further concedes that he omitted material information during discovery, made misrepresentations, and engaged in inappropriate conduct, but claims it was "no harm, no foul."  Viewed in its totality, plaintiff's misconduct warrants dismissal.  Plaintiff cannot use the Fifth Amendment as a shield to sanctions, and it is disingenuous for him to argue that he cannot respond to the motion because of his Fifth Amendment rights.  He has already made statements to an investigator with the Federal Protective Services and to the Colorado Supreme Court Attorney Regulation Counsel when he engaged in further harassing conduct against defendant by filing a grievance against defense counsel.  Plaintiff concedes that he omitted information from his interrogatory responses to Interrogatory Nos. 4 and 5, that he submitted an incomplete list of his criminal history in Interrogatory No. 8, committed application falsification, failed to provide a complete answer at his deposition regarding his prior history of psychological treatment, provided misinformation regarding his treatment history in his discovery responses and during his deposition, engaged in inappropriate name calling at his deposition, and that his conduct was clearly inappropriate.  Regarding the information about MurrayHill that was omitted from discovery responses purportedly because of a confidential settlement, plaintiff's counsel in that other matter was Nelson Alston – his counsel of record in this matter.  "It is absurd for McArthur to claim that somehow he believed he had no obligation to disclose this information; he was represented by the same counsel."

(Docket No. 96 at 4).  Furthermore, the transcript shows that plaintiff hardly volunteered

the information about MurrayHill and was vague and evasive about any other non-

disclosed employment history.  In addition, as of the date of the Reply, plaintiff had still

not provided any supplemental disclosures or supplemental discovery responses to

ensure that all information regarding his prior employment history and claims have been

disclosed.  He also has not produced additional information about his history of

psychological treatment and counseling or his criminal history.  The only reason

defendant even knew about the omitted prior counseling and treatment, and plaintiff's

false deposition testimony regarding the same, was due to a notation in plaintiff's

expert's file subpoenaed by defendant.  "Plaintiff's argument that Defendant has not

been prejudiced is incredulous–the omissions have not been cured."  (Docket No. 96 at

5).  According to defendant, "[b]ased on his blatant dishonesty, under oath, about his

employment history, prior claims, civil and criminal history, and psychological treatment

and counseling, Defendant has no way to discern whether all relevant and discoverable

information has been disclosed, and what is true or false.  Defendant likewise has been

severely prejudiced by having to conduct additional discovery and subpoena third

parties to attempt to learn information that should have been disclosed by McArthur, but

was not."  (Docket No. 96 at 6).

　　　"A district court has inherent equitable powers to impose the sanction of

dismissal with prejudice because of abusive litigation practices during discovery."

Garcia v. Berkshire Life Ins. Co. of Am., 569 F.3d 1174, 1179 (10th Cir. 2009).

"Because of the harshness of dismissal, however, due process requires that the

violation be predicated upon willfulness, bad faith, or [some] fault of [plaintiff] rather than

inability to comply." Id. (quoting Archibeque v. Atchison, Topeka & Santa Fe Ry. Co.,

70 F.3d 1172, 1174 (10th Cir. 1995)).  The Tenth Circuit has adopted a non-exclusive

five-part test for determining the propriety of dismissal when a plaintiff engages in

abusive litigation practices: (1) the degree of actual prejudice to the defendant; (2) the

amount of interference with the judicial process; (3) the culpability of the litigant; (4)

whether the court warned the party in advance that dismissal of the action would be a

likely sanction for non-compliance; and (5) the efficacy of lesser sanctions.  See id.,

Ehrenhaus v. Reynolds, 965 F.2d at 920-21.  The mere fact that a plaintiff did not

receive an explicit warning that dismissal would be a likely sanction for fabricating

evidence is not a prerequisite to the imposition of dismissal sanctions.  See Garcia, 569

F.3d at 1180; Archibeque, 70 F.3d at 1175 (upholding dismissal even though no

warning given).

        Here, if the finding above that summary judgment should enter for the defendant

and against the plaintiff is accepted, then the motion for dismissal becomes moot.

Furthermore, the motion for other sanctions may also essentially be moot because

inasmuch as each of the plaintiff's claims includes a claim pursuant to 42 U.S.C. §

1981, defendant may very well be entitled to an award of attorney fees as the prevailing

party pursuant to 42 U.S.C. § 1988 given the frivolousness of this action.  See Hull v.

Colorado Bd. of Governors of Colorado State University, –- F. Supp.2d —, 2011 WL

1134991, at *14 (D. Colo. Mar. 28, 2011) ("A prevailing defendant may recover an

attorney's fee only where the suit was vexatious, frivolous, or brought to harass or

embarrass the defendant.") (quoting Hensley v. Eckerhart, 461 U.S. 424, 429 n.2

(1983)).

39

In any event, the court finds that as detailed by the defendant, plaintiff has committed a pattern of discovery abuses involving material discovery omissions, dishonesty, slurs and insults to defendant and defense counsel, threats to sue defense counsel and defense counsel's firm, and a physical assault of defense counsel during plaintiff's deposition in this court's jury room.  Substantially for the reasons stated in the defendant's motion and reply, if the recommendation concerning the motion for summary judgment is not accepted, then it is recommended that the defendant's motion for dismissal and sanctions be granted.  At the very least, defendant should be awarded monetary sanctions, such as the fees and costs incurred by defendant to prepare for and depose plaintiff; the fees and costs incurred by defendant to prepare and file the present motion; and striking plaintiff's request for front pay, his claim for emotional distress, and any award of back pay after April 8, 2011 (the date the plaintiff's discovery responses were due, and if responded to honestly, would have provided information about his material misrepresentations on his employment application, his criminal history, and termination from prior employment).

**WHEREFORE,** for the foregoing reasons it is hereby

**RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket No. 100) be granted and that judgment be entered for the defendant and against the plaintiff on all claims.  If this recommendation is accepted, then it is further

**RECOMMENDED** that Defendant's Motion to Dismiss and for Sanctions (Docket No. 73) be denied as moot with respect to dismissal and granted with respect to monetary sanctions as detailed in the text above.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2),**

the parties have fourteen (14) days after service of this recommendation to serve

and file specific written objections to the above recommendation with the District

Judge assigned to the case.  A party may respond to another party's objections

within fourteen (14) days after being served with a copy.  The District Judge need

not consider frivolous, conclusive, or general objections.  A party's failure to file

and serve such written, specific objections waives *de novo* review of the

recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53

(1985), and also waives appellate review of both factual and legal questions.

<u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley

v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).


Date:  December 20, 2011                    s/ Michael J. Watanabe
          Denver, Colorado                        Michael J. Watanabe
                                                          United States Magistrate Judge